IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

RITA M. McGHEE,                    )
                                   )
Plaintiff,                         )
                                   )
v.                                 )
                                   ) Case No.  2:11CV00098SPM
                                   )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
Defendant.                         )

## MEMORANDUM OPINION

This is an action under 42 U.S.C. § 405(g) for judicial review of the final

decision of Defendant Michael J. Astrue, the Commissioner of Social Security,

denying the application of Plaintiff Rita M. McGhee for disability insurance

benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and

for Supplemental Security Income (SSI) under Title XVI of the Social Security

Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act").  For the reasons stated below, the

court affirms the Commissioner's denial of Plaintiff's application.

## I.
### PROCEDURAL HISTORY

Plaintiff filed her application for benefits under Titles II and XVI of the

Act on November 13, 2008, claiming disability because of problems with her

knees, back, neck, heart, and left foot; blurred vision; stigmatism; numbness

and tingling in her hands; no hearing in her left ear; and major acid reflux.  (Tr.

135).  Plaintiff's applications were denied initially.  (Tr. 53-60).  A hearing was

held before the Honorable Lance K. Hiltbrand, an Administrative Law Judge ("ALJ") on May 5, 2012. (Tr. 20-52). Following the hearing, on June 21, 2010, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. (Tr. 5-19). The ALJ "considered but assign[ed] little weight" to the opinion of Dr. Fortunato, Plaintiff's treating physician since May of 2009. The ALJ also concluded that Plaintiff was capable of performing her past relevant work as a sewing machine operator, inspector, cashier/checker and production assembler. (Tr. 18). On November 18, 2011, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stands as the final decision of the Commissioner.

In appealing the Commissioner's decision, Plaintiff argues that the ALJ erred by affording little weight to the assessment of her treating physician, Dr. Fortunato. See Pl.'s Br. at 14-17. Plaintiff also argues the ALJ committed reversible error by failing to make explicit findings about the physical demands of Plaintiff's past relevant work and by failing to make a finding about Plaintiff's ability to use her hands and arms in determining Plaintiff's residual functional capacity. Pl.'s Br. at 18-20. Finally, Plaintiff argues that the case should be remanded for clarification because although the ALJ's **written** opinion about Plaintiff's residual functional capacity stated that Plaintiff had "a mild to moderate to **severe** level of fatigue and discomfort," at the hearing, the ALJ failed to include the qualifier "severe" in his hypothetical to the vocational expert. Reply Br. at 2 (emphasis added).

## II.
### FACTUAL BACKGROUND

### A. BACKGROUND

Plaintiff Rita M. McGhee was born May 21, 1960. (Tr. 26.) She is divorced and, in the two years leading up to her May 5, 2010 hearing, she lived with her boyfriend, Ricky Moore, a 57 year old disabled factory worker who lost one of his hands in a factory accident. (Tr. 27-29). Plaintiff graduated from High School in 1976 and has had no vocational training. (Tr. 26).

Plaintiff filed for benefits on November 13, 2008, citing problems with her knees, back, neck, heart, and left foot; blurred vision; stigmatism; numbness and tingling in her hands; no hearing in her left ear; and major acid reflux. (Tr. 135). Plaintiff claimed her conditions first interfered with her ability to work on December 12, 2003, when she suffered an on-the-job injury. (Tr. 10, 135). Plaintiff claimed she became unable to work on March 31, 2004. (Tr. 135). Plaintiff testified that she fell at work and put a "big crease in [her] head." Plaintiff further testified:

> I fell. I knocked a big dent in my head. You can see it. It's still there. I hit a real heavy-duty table. I fell on a, a pallet. They had it, they had it rigged up kind of threw me off balance, and I caught my toe in it, and I fell and it kind of knocked me out for a few minutes. When I woke up, I went up and told them what happened, and I had a big knot here.

(Tr. 31).

After the incident, Plaintiff went back to work at the plastics factory for "maybe a week." She repeatedly told her employer her condition was "getting pretty bad, and [her] back hurts a lot." Although her employer sent her to

therapy, it did not really help her condition and she ultimately left the plastics factory.  (Tr. 33).

Plaintiff testified that since the incident in 2003, she has had trouble standing and has not been able to stand for more than 20 minutes without lower back pain and pain between her shoulders and arms.  (Tr. 43).  She will sit in a recliner to try to relieve pressure but can only do so for about 30 minutes before her back starts hurting.  (Tr. 43-44).  Plaintiff has trouble sleeping and only sleeps three to four hours a night.  As a result, she is tired and cranky the next day and she falls asleep during the day.  (Tr. 44).  Plaintiff states that because she has to lie down or sit down seven times a day for thirty minutes at a time, she would not be able to go back to doing any of the factory work she did in the past.  (Tr. 45).

Despite the foregoing limitations, Plaintiff testified that she is able to dress herself and take care of her own personal hygiene.  (Tr. 37).  She is also able to do the laundry, and house cleaning, dishes, with help from her disabled boyfriend.  (Tr. 37-39).  Plaintiff doesn't drive anymore out of fear that she will fall asleep at the wheel.  (Tr. 39).  In forms she completed as part of the disability application process, Plaintiff indicated that she cared for her pet bird and tended to plants and flowers.  (Tr. 18, 163).

**B. MEDICAL TREATMENT**

Plaintiff testified that following her on-the-job injury in 2003, she went to the hospital but did not file a claim for worker's compensation; (Tr. 31) however, Pl indicated in her application for disability that she <u>did</u> file for

worker's compensation. (Tr. 138)  As noted above, her employer sent her to therapy for about two months when she continued to complain about pain. (Tr. 33).  Although physical therapy records were requested, none were found for Plaintiff.  (Tr. 11, 190).  Since her part-time work in 2006, Plaintiff has not been hospitalized for any reason that she can recall.  (Tr. 34).

A review of the record shows that, in addition to physical therapy, Plaintiff sought treatment for her back with a Dr. Beverly Peters sometime in 2005 or 2006.  Plaintiff had her eyes examined in 2008, and began treatment with Dr. Vincent Fortunato for a variety of ailments in May of 2009.  (Tr. 11, 34-35, 137-138, 189-228).

## 1. DR. PETERS

In her application materials Plaintiff indicated that she treated with a Dr. Beverly Peters in Lutesville, Missouri, in 2005 or 2006 for her back.  (Tr. 137). She indicated that Dr. Peters "popped" her when she would go in and x-rayed her finger.  (Tr. 138).  There is no evidence that the ALJ requested or received records from Dr. Peters.  Neither the Commissioner nor Plaintiff referenced Dr. Peters in any of their submissions to the court.

## 2. 2007 EYE EXAM

Plaintiff's *earliest* medical record is from a December 17, 2007,  eye exam at Walmart's Vision Center.  (Tr. 11, 189).  When asked about her history during the December 2007 eye exam, it was recorded that Plaintiff had "no complaints."  Her unaided vision was 20/70 in both eyes.  (Tr. 11, 189).

### 3. DR. FORTUNATO

Plaintiff first visited Dr. Fortunato on May 4, 2009.  At that visit, she presented with complaints of "occasional and moderate heartburn" including symptoms of nausea, reflux, regurgitation and sour fluid in mouth.  (Tr. 200). Plaintiff reported a history of nephrolithiasis[1] and constant, chronic back pain with symptoms including radiation of pain to the left thigh and numbness.  (Tr. 200-201).  Dr. Fortunato's notes indicate that the back pain was caused by an occupational injury and was aggravated by bending and worsened by lifting and movement.  (Tr. 200).

According to notes from his physical examination of Plaintiff, Dr. Fortunato found Plaintiff in "no apparent distress, alert, oriented x3, cooperative, normally developed, well nourished, well hydrated."  (Tr. 201).  He also found her to have diffuse 5/5 strength, normal light touch, normal pin prick, and reflexes normal and symmetric.  His assessment at the end of the visit was that she had gastroesophageal reflux disease, elevated blood pressure without diagnosis of hypertension and acute low back pain.  (Tr. 202).  He ordered testing and scheduled a follow up visit in three months.  (Tr. 202-203).

Plaintiff next visited Dr. Fortunato on August 6, 2009.  At that visit she presented with complaints of constant back pain with symptoms including radiation of pain in the lumbar region over her spine.  She described the pain as a moderate ache aggravated by bending and worsened by lifting and movement.  Plaintiff also complained of intermittent neck pain in the

---

[1] Commonly known as kidney stones or renal calculi.  Johns Hopkins Children's Center, http://www.hopkinschildrens.org/nephrolithiasis.aspx.

occipitocervical area, midcervical area. Plaintiff also presented with dysethesia[2] on the left palmar hand along the entire left anterior forearm. Duration of the dysethesia is "minutes" and it has no known cause but it impairs activities of daily living. (Tr. 205). Dr. Fortunato's findings upon physical examination (if any) and assessment following that visit are not included in the record. (Tr. 205-206).[3]

Plaintiff's next visit with Dr. Fortunato was on December 3, 2009. At her December visit, Plaintiff complained about intermittent weak grip in her right and left hands. She also complained about intermittent neck pain which began six weeks before the visit and low back stiffness which did not include radiation of pain. (Tr. 210).

Upon examining Plaintiff, Dr. Fortunato found she had limited range of motion in her back, left shoulder and right shoulder, and full range of motion of her neck. Dr. Fortunato also found that in general Plaintiff was in "no apparent distress, alert, oriented x3, cooperative, normally developed, well nourished, well hydrated with no extremity edema." With respect to her neurological functioning Dr. Fortunato found that Plaintiff had diffuse 5/5 strength, normal light touch, normal pin prick, reflexes normal and symmetric, coordination intact and gait steady. (Tr. 211). His assessment at the end of

---

[2] Dysethesia is "impairment of sensation short of anesthesia. A condition in which a disagreeable sensation is produced by ordinary stimuli; caused by lesions of the sensory pathways, peripheral or central. Abnormal sensations experienced in the absence of stimulation. STEDMAN'S MEDICAL DICTIONARY 596 (28th ed. 2006).

[3] The first page of the 8/6/2009 progress notes indicate that there are four pages of notes; however the record contains only page 1 and 4 of the progress notes.

the visit was that she had a contusion of the neck and acute low back pain. He prescribed Darvocet for pain. (Tr. 212-213).

At the hearing on May 5, 2010, Plaintiff testified that she had been seeing Dr. Vincent Fortunato for a year. (Tr. 34-35). Dr. Fortunato told her she had carpal tunnel syndrome and back pain, prescribed pain pill prescriptions and indicated he wanted her to wear braces. However, he did not perform any MRI or EEG studies. (Tr. 35-36). Following the hearing, on June 30, 2011, Plaintiff's attorney submitted additional medical progress reports from Dr. Fortunato dated 3/18/2010, 7/2/2010, and 3/3/2011 to the Appeals Council. (Tr. 214-228).

During the March 18, 2010 visit, Plaintiff complained about burning, moderate and constant abdominal pain, intermittent edema on the right and left ankle, and moderate intermittent neck pain. (Tr. 216). As in earlier visits, Dr. Fortunato's physical examination found Plaintiff in no apparent distress, alert and oriented, normally developed, well nourished, well hydrated with no extremity edema. He also found her to be alert and oriented, with diffuse 5/5 strength, normal light touch, normal pin prick and reflexes normal and symmetric. Her coordination was intact and gait steady. His assessment was that she had abdominal pain and, despite his physical findings, edema and a muscle strain of her neck. (Tr. 218).

On July 2, 2010, Plaintiff was again seen by Dr. Fortunato. Her primary complaint was moderate and constant neck pain. Plaintiff also complained of anorexia and moderate and chronic constant depression. The progress notes

indicate Dr. Fortunato and Plaintiff discussed a contusion involving her right arm, left arm and around her right eye, which had resolved by the time of the July 2nd visit. The progress notes further indicate Plaintiff was beaten up by her ex-husband's girlfriend. (Tr. 220).

As in earlier visits, Dr. Fortunato's physical examination found Plaintiff in no apparent distress, alert and oriented, normally developed, well nourished, well hydrated with no extremity edema. He also found her to be alert and oriented, with diffuse 5/5 strength, normal light touch, normal pin prick and reflexes normal and symmetric. Her coordination was intact and gait steady. (Tr. 221). Dr. Fortunato also found Plaintiff's affect was normal and found her alert and oriented and her behavior normal. (Tr. 221-222). Dr. Fortunato's assessment was that Plaintiff had cervical osteoarthritis and, notwithstanding his finding of normal behavior upon physical examination, recurrent major depression. (Tr. 222).

At the March 3, 2011 visit, Plaintiff complained of constant back pain, moderate and recurrent headache and moderate and chronic depression. (Tr. 224). Dr. Fortunato's findings on physical examination of Plaintiff were consistent with earlier visits. His assessment was that she had headaches, chronic worsening back pain, recurrent major depression and abnormal weight gain. (Tr. 226).

**C. OPINION EVIDENCE**

### 1. DR. SPARKS' CONSULTATIVE EXAMINATION – JANUARY 22, 2009

On January 22, 2009, Plaintiff was examined by consultative examiner Dr. John Sparks, D.O. In his report, Dr. Sparks noted that Plaintiff presented with the following complaints: (i) knee pain (with a pain level of 8 on a scale of 0-10 with 10 being emergency type pain); (ii) constant back and neck pain (with a pain level of 8 on a scale of 0-10); (iii) blurred vision; (iv) hearing loss in her right ear; (v) pain in her left foot from bunions (with a pain level of 6 on a scale of 0-10); (vi) reflux esophagitis; and (vii) chest pain. (Tr. 189-197).

Following a physical examination, Dr. Sparks found that, among other things, Plaintiff had a full range of motion of her shoulders, elbows, wrists, knees, hips, ankles, and spine. Plaintiff had normal grip strength in both hands. She was also able to fully extend her hands, make a fist, and oppose her fingers. (Tr. 191-192). There was no need for an orthopedic device to assist with ambulatory activity and Plaintiff was able to squat without difficulty. Plaintiff was able to tandem walk and also walk on her heels and toes. Plaintiff responded well to pressure stimulation, vibratory stimulation and touch. Plaintiff did not complain of any pain to palpation of her entire spinal area including the thoracic area that she complained of pain prior to the examination. (Tr. 196). Spine, and straight leg raise testing was normal. (Tr. 192, 196).

Dr. Sparks' impressions were that Plaintiff had (i) reflux esophagitis (acid reflux), (ii) bunions on her left foot, (iii) astigmatism with resultant blurred

vision, (iv) early osteoarthritis, and (v) loss of air conduction to the right ear with preservation of bone conduction.  (Tr. 196).  Dr. Sparks concluded: "With this examination I find no evidence that would keep this person from performing work related functions and seeking employment.  (Tr. 197).

### 2.  DR. FORTUNATO'S MSS CHECKLIST – DECEMBER 3, 2009

On December 3, 2009, Plaintiff's treating doctor, Dr. Fortunato, completed a fill-in-the-blank type Medical Source Statement - Physical, in which he opined that Plaintiff could lift and carry five pounds frequently, stand or walk continuously for less than twenty minutes, and sit continuously for one hour.  (Tr. 207).  Dr. Fortunato also opined that Plaintiff was limited in her ability to push and/or pull; and she could never climb, balance, stoop, kneel, crouch, or bend. (Tr, 207-208).  The doctor further found that Plaintiff was limited in reaching, handling, and fingering, and she was able to do each of these activities for two hours.  (Tr. 208).  He also concluded that assuming a reclining position, assuming a supine position for up to 30 minutes 1-3 times a day, and propping her legs up 1-3 times a day would be helpful to Plaintiff. (Tr. 209).  Dr. Fortunato indicated that his conclusions about Plaintiff's impairments and limitations were predicated principally on his examination of Plaintiff and Plaintiff's history.  (Tr. 17, 209).

### D. VOCATIONAL EVIDENCE

In her disability application materials, Plaintiff identified ten jobs she held in the ten years before she became unable to work.  Plaintiff provided additional information about the physical demands of six of the ten jobs she

listed. (Tr. 156-161). Of the six jobs detailed, four of them involved sewing and or inspecting at a sewing factory. (Tr. 156-161).[4] She also worked on the assembly line at a company called Breaded Products Co. (Tr. 155, 158). Finally, Plaintiff worked in retail at Walmart. (Tr. 155, 161).

She worked the longest at Columbia Sportswear, a sewing factory as an inspector/sewer. (Tr. 47, 136, 155). In describing her sewing and inspecting work, Plaintiff indicated that her duties included inspecting clothing for defects. Her duties required her to lift and move a dozen coats maybe 5 feet. She would also sit and stand for 8 hours, stoop for an hour, and handle, grab or grasp big objects for 8 hours, and lift no more than 10 pounds. (Tr. 160). However, Plaintiff indicated she did not lift more than 10 pounds at any of the sewing factory jobs. (Tr. 156-160).

Plaintiff described her production/assembly work at Breaded Products Company as requiring her to separate food as it came down the belt. That job required Plaintiff to stand for 8 hours, stoop for 8 hours, crouch for 6 hours, type or handle small objects for 8 hours, and lift less than 10 pounds. (Tr. 155, 158). Finally, Plaintiff described her retail work at Walmart as requiring her to keep clothes sorted, help customers find what they needed, and help put price tags on clothes. Plaintiff indicated that her retail position at Walmart also required her to walk and stand for 8 hours, stoop for an hour, kneel for an

---

[4] Plaintiff indicated that she sewed and/or inspected for the following sewing factories: JFC Manufacturing, Akbani Industries, Paramount Headwear, and Columbia Sportswear. (Tr. 155, 161).

hour, handle, grab or grasp big objects for an hour. Plaintiff indicated "We didn't have much in lifting to do." (Tr. 155, 161).

Plaintiff last worked in the summer of 2006 as an inspector at a sewing factory in Piedmont, Missouri. (Tr. 29). The position was a part-time or as-needed position and Plaintiff testified that she quit or was let go because headaches and other difficulties prevented her from keeping up with the demands of the job. (Tr. 29, 42).

At the hearing before the ALJ, vocational expert, John F. McAllen was called to testify. After summarizing Plaintiff's work history, Dr. McAllen provided the following testimony in response to the ALJ:

> Q: This hypothetical individual can occasionally lift and carry objects no more than twenty pounds, frequently lift or carry objects up to ten pounds; stand and/or walk with normal breaks six hours in an eight-hour workday; and sit with normal breaks a total of six hours in an eight-hour workday. As the non-exertional limitations as for all postural limitations, in climbing, balancing, kneeling, crouching, crawling, and stooping, all of those are going to be occasional; and experiences a mild to moderate level of fatigue and discomfort, affecting her ability to work in a competitive environment. Based on these exertional and non-exertional limitations, can this hypothetical individual perform any of her past relevant work as she previously performed it, or how it's generally performed in the regional and national economy, please?
>
> A: Your Honor, if those were the only limitations, my answer is yes to sewing machine, to Wal-Mart, and to the plastic tool and dye.

(Tr. 50-51).

### III.
### Decision Of The ALJ

The ALJ, Lance K. Hiltbrand, found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009, and that she had not engaged in substantial gainful activity after March 31, 2004, her alleged onset date.  (Tr. 10).

The ALJ further found that Plaintiff has the following severe impairments: nephrolithiasis (from May of 2009), reflux esophagitis, bunions of the left foot, astigmatism with resultant blurred vision corrected by glasses to 20/30, early osteoarthritis, elevated blood pressure, and loss of air conduction to right ear with preservation of bone conduction.  The ALJ went on to find that Plaintiff did not have an impairment or combination of impairments that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13).

The ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b).  He further found that she has the ability to occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds.  He found that she has the ability to walk and/or stand (with normal breaks) 6 hours of an 8-hour workday and sit (with normal breaks) 6 hours of an 8-hour workday.  He found she has postural limitations of occasionally climbing, balancing, stooping, kneeling, crouching, and crawling.  Finally, he found that she has a mild to moderate to severe level of fatigue and discomfort affecting her ability to work in a competitive environment.  (Tr. 14).

The ALJ relied on the consultative examination of Dr. Sparks, noting:

Dr. Sparks noted the claimant did not complain of any pain to palpation of the entire spinal area, including the thoracic area that she complained of pain prior to examination. His impression was reflux esophagitis, bunions of the left foot, astigmatism with resultant blurred vision, early osteoarthritis, and loss of air conduction to the right air (sic) with preservation of bone conduction.

. . .

In sum, the above residual functional capacity assessment is supported by the opinion of the consultant examiner Dr. Sparks who opined that '***With this examination I find no evidence that would keep this person from performing work related functions and seeking employment.***'

(Tr. 16, 18) (internal citations omitted) (emphasis in original).

In reaching his decision, the ALJ "considered but assign[ed] little weight to the opinion of Dr. Fortunato." The ALJ discounted Dr. Fortunato's opinion because:

[t]he treating physician's opinion is brief and conclusory and unsupported by medically acceptable clinical laboratory diagnostic techniques. Dr. Fortunato's conclusions are inconsistent with his progress notes and with the testimony of the claimant at the hearing. *Although dysesthesia and weak grip were alleged, examination of the extremities showed diffuse 5/5 strength, normal light touch, normal pin prick, and normal reflexes (Exhibits 5F and 7F).* Although Dr. Fortunato indicated claimant's weak grip impaired normal activities of daily living, the claimant testified at the hearing that she was able to attend to her personal hygiene, do laundry, clean house, and do the dishes. In Adult Function reports, the claimant stated that she fed her pet bird and tends to her plants/flowers (Exhibit 5E). There was no indication of a positive Tinel's sign, no indication of any imaging studies taken, and no recommendations for physical therapy, epidural steroid injections, or other treatment. Further, Dr. Fortunato's assessment is inconsistent with findings of the consultative examiner including normal range

15

of motion, normal grip strength, and normal strength in upper and lower extremities.

(Tr. 18).

The ALJ next found, relying on the testimony of Vocational Expert John McAllen, that Plaintiff was capable of performing her past relevant work as a sewing machine operator and inspector; cashier/checker and production assembly. (Tr. 18). The ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from March 31, 2004, through the date of his decision, and that she was not disabled under the Social Security Act. (Tr. 19).

## IV.
## GENERAL LEGAL PRINCIPLES

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence is 'less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" Renstrom v. Astrue, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting Moore v. Astrue, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. Id. However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the

credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" Id. (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

A court should disturb the ALJ's decision only if it falls outside the available "zone of choice" and a decision is not outside that zone of choice simply because the court may have reached a different conclusion had the court been the fact finder in the first instance. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives,

or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work..." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a); see also McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); McCoy, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); McCoy, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); McCoy, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir.2009) (citing 20

C.F.R. § 404.1545(a)(1)); see also 20 C.F.R. §§ 404.1520(e), 416.920(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC assessment with the physical and mental demands of the plaintiff's past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  Id.  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(v); McCoy, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled.  Moore, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012); see also 20 C.F.R. §§ 404.1520(a)(4)(v), 404.920(a)(4)(v).  However, the claimant bears the burden of persuasion to prove disability throughout the five-step process, even when the burden of production shifts to the Commissioner at Step Five.  Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

## V.
### DISCUSSION

The primary issues to be resolved are (i) whether the ALJ's decision is supported by substantial evidence in light of the fact that the ALJ assigned little weight to the opinion of Plaintiff's treating physician; (ii) whether in determining Plaintiff's residual functional capacity the ALJ erroneously failed to make explicit findings about the demands of Plaintiff's past relevant work and to make a finding about Plaintiff's ability to use her hands and arms; and (iii) whether the discrepancy between the ALJ's written opinion of Plaintiff's residual functional capacity and the hypothetical posed to the vocational expert warrants a reversal and remand for clarification of the ALJ's true finding of residual functional capacity.

### A. THE ALJ'S DECISION TO ASSIGN LITTLE WEIGHT TO THE OPINIONS OF DR. FORTUNATO.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because it impermissibly discounted the opinions of her treating physician, Dr. Fortunato. (Tr. 207-209). See Pl.'s Br. at 14-17. Although a treating physician's opinion is generally given controlling weight, it is not inherently entitled to it. Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be "inconsistent with the other substantial evidence in [the] case record." Hacker, 459 F.3d at 937 (quoting 20 C.F.R. § 404.1527(d)(2)). See also Wagner v.

<u>Astrue</u>, 499 F.3d 842, 848 (8th Cir. 2007).  It is the ALJ's duty to resolve conflicts in the evidence, and the ALJ's finding in that regard should not be disturbed so long as it falls within the "available zone of choice."  <u>See</u> <u>Hacker</u>, 459 F.3d at 937-938.

In deciding to assign "little weight" to Dr. Fortunato's opinion, the ALJ noted that Dr. Fortunato did not begin treating Plaintiff until May of 2009, which is more than five years after her alleged disability onset date.  (Tr. 11, 17, 18).  In determining what weight to afford opinions of the treating doctor, it is appropriate for the ALJ to consider the length of the doctor-patient relationship.  <u>See</u> <u>Randolph v. Barnhart</u>, 386 F.3d 835, 840 (8th Cir. 2004) (holding that substantial evidence supported the ALJ's decision to not give controlling weight to a treating doctor's opinion where, among other factors, the treating doctor had only met with plaintiff on three prior occasions before filling out the checklist and where the doctor's treatment notes did not indicate the doctor had sufficient knowledge upon which to formulate an opinion as to plaintiff's ability to function in a workplace).  It is also appropriate for the ALJ to consider the quantity and quality of objective medical information that would have been available to the treating doctor at the time he or she rendered his or her opinion in light of the length of the doctor-patient relationship.  <u>Id.</u>

The ALJ also found that Dr. Fortunato's opinion was not entitled to controlling weight because it was "brief, conclusory and unsupported by medically acceptable clinical diagnostic techniques."  (Tr. 18).  Notwithstanding this determination, when the ALJ's decision is read in its entirety, it is clear

that the ALJ did not reject Dr. Fortunato's findings *in toto*. For example, in determining that Plaintiff had severe impairments, the ALJ accepted Dr. Fortunato's findings of nephrolithiasis and GERD in his May 2009. (Tr. 10-11, 200-204). The ALJ's finding that Plaintiff has "postural limitations of occasionally climbing, balancing, stooping, kneeling, crouching and crawling" also appears to be, at least to some extent, predicated on limitations found by Dr. Fortunato.[5]

The ALJ did, however, reject Dr. Fortunato's opinions that Plaintiff had limitations related to handling, reaching and fingering. In so doing, the ALJ points out that, although Plaintiff complained of a weak grip, Dr. Fortunato's treatment notes contain no objective findings regarding reaching or handling limitations. (Tr. 18, 200-206, 210-213). Plaintiff herself testified at the hearing that Dr. Fortunato diagnosed her with carpal tunnel syndrome and wanted her to wear a brace but did so without performing any diagnostic testing. (Tr. 35-36). "A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability." Travis, 477 F.3d at 1041. The ALJ in the instant case determined that Dr. Fortunato's opinion was not entitled to controlling weight in part because it was "brief, conclusory and unsupported by medically acceptable clinical diagnostic techniques." Substantial evidence supports the ALJ's finding that the objective medical

_____

[5] More specifically, in light of the fact that Consultative Examiner Sparks found no limitations, it appears that the lifting and postural limitations as well as the non-exertional limitations found by the ALJ are predicated on Dr. Fortunato's findings.

evidence of record did not support Dr. Fortunato's conclusions that Plaintiff had handling and fingering limitations.

Finally, the ALJ found that Dr. Fortunato's opinion was not entitled to controlling weight because it was inconsistent with his progress notes, Plaintiff's testimony, and the findings of the consultative examiner. (Tr. 18). It is well-established that if the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. Travis, 477 F.3d at 1041; Hacker, 459 F.3d at 937. Indeed, the Eighth Circuit has held:

> A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions. We have allowed an ALJ to substitute the opinions of non-treating physicians in several instances, including where a treating physician "renders inconsistent opinions that undermine the credibility of such opinions."

Hacker, 459 F.3d at 937 (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). See also Goetz v. Barnhart, No. 05-2267, 2006 WL 1512176, at *2 (8th Cir. June 2, 2006) (unpub. per curiam) (declining to give controlling weight to the treating physician's opinion because the treating physician's notes were inconsistent with her residual functional capacity assessment)).

Here, the ALJ found that Dr. Fortunato's opinion in the MSS checklist that Plaintiff had handling, fingering and reaching limitations was inconsistent with his findings in his neurological examinations that Plaintiff had diffuse 5/5 strength, normal reflexes, and normal coordination. (Tr. 18, 202, 211). Although Plaintiff's chief complaint at the time of her December 2009 visit was "weak grip," Dr. Fortunato's assessment following that visit made no reference

to problems with Plaintiff's grip or her ability to use her hands and arms to reach or handle items. Indeed, notwithstanding Plaintiff's complaints of dysethesia and "weak grip," none of Dr. Fortunato's treatment notes either before or after the December 2009 visit reflect that he ever found reaching and handling limitations.

The ALJ also found Dr. Fortunato's opinion regarding Plaintiff's limitations was inconsistent with Plaintiff's testimony that she was able to attend to her personal hygiene, wash laundry, clean the house, and do the dishes. (Tr. 18, 37-39). The ALJ similarly found Dr. Fortunato's opinion inconsistent with representations made by Plaintiff in forms she completed as part of the disability application process in which Plaintiff indicated that she cared for her pet bird and tended to plants and flowers. (Tr. 18, 163).

Additionally, the ALJ found Dr. Fortunato's assessment inconsistent with the objective examination findings of consultative examiner John Sparks, D.O. (Tr. 18, 191-197). As the ALJ noted, contrary to the limitations assessed by Dr. Fortunato, Dr. Sparks found that Plaintiff had a full range of motion of her shoulders, elbows, wrists, knees, hips, ankles, and spine. (Tr. 18, 191-192). Plaintiff did not complain of any pain to palpation of her spine, and straight leg raise testing was normal. (Tr. 18, 192, 196). Further, notwithstanding Plaintiff's complaints of numbness and tingling in her hands, Dr. Sparks found that Plaintiff had normal grip strength in both hands. (Tr. 18, 191). She was also able to fully extend her hands, make a fist, and oppose her fingers. (Tr. 191).

Having reviewed the record as a whole and the ALJ's reasoning, the undersigned cannot say that the ALJ was in error when he opined that Dr. Fortunato's assessment of Plaintiff's limitations was inconsistent with Plaintiff's testimony and daily activities. Nor does the undersigned find that looking at the record as a whole the ALJ erred by opining that Dr. Fortunato's opinion is inconsistent with his own progress notes and the findings by the consultative examiner.

In sum, in compliance with the applicable regulations, the ALJ assessed the record as a whole to determine whether the treating physician's opinion was inconsistent with other substantial evidence on the record. 20 C.F.R. § 404.1527(d)(2). Having determined that it was, the ALJ properly diminished the weight given to the treating doctor's opinion.

**B.     THE ALJ'S DETERMINATION OF RESIDUAL FUNCTIONAL CAPACITY.**

Plaintiff contends that the ALJ committed reversible error in determining Plaintiff's residual functional capacity because he did not discharge his duty to make explicit findings about the demands of Plaintiff's past relevant work and erroneously failed to make a finding about Plaintiff's ability to use her hands and arms. Pl.'s Br. at 18-20.

*1.     DUTY TO FULLY INVESTIGATE PLAINTIFF'S PAST RELEVANT WORK.*

As Plaintiff correctly notes in her brief, it is well established that the ALJ has a duty to fully investigate and make explicit findings regarding the actual physical and mental demands of the claimant's past work. Pfitzner v. Apfel, 169 F.3d 566, 569 (8th. Cir. 1999); Sells v. Shalala, 48 F.3d 1044, 1046 (5th

Cir. 1995). However, the ALJ may discharge that duty by referring to specific job descriptions in the Dictionary of Occupational Titles and by relying on testimony of a vocational expert. <u>Pfitzner</u>, 169 F.3d at 569; <u>see</u> <u>also</u> <u>Wagner v. Astrue</u>, 499 F.3d 842, 853-54 (8th Cir. 2007) (holding that the ALJ may rely on the testimony of a vocational expert in determining past relevant work).

That is precisely what the ALJ did in the instant case. At the hearing, the ALJ questioned the vocational expert about Plaintiff's past relevant work:

> Q    Okay, based on the vocational information in the case file and today's testimony, can you please describe the claimant's past relevant work for the last 15 years, please?
>
> A    Yes, Your Honor, her longest job was there on that sewing factory. I think it was Columbia Sportswear, wasn't it?
>
> CLMT:    Um-hum
>
> A    . . . . [S]he was both a sewing machine operator, and inspector . . .
>
> A    Your Honor, the sewing machine operator is a specific <u>DOT</u> Number. Your Honor, the strength on that is light, and the SVP: 4 which is semi-skilled. Your Honor, she obviously was doing inspecting work, I think during all the times she was there. There is a slightly different <u>DOT</u> on that. Your Honor, the strength, though remains basically light.

(Tr. 46-51).

While this testimony by the vocational expert is less than clear, it nevertheless demonstrates that the vocational expert's description of Plaintiff's past relevant work incorporated specific job descriptions used in the Dictionary of Occupational Titles. The ALJ made reference to both the vocational expert and the DOT when he explained the basis of his finding that Plaintiff is capable

of performing past relevant work as a sewing machine operator, inspector, cashier/checker, and production assembly:

> The vocational expert testified that the claimant has past work as a sewing machine operator, described as light and semi-skilled work (SVP 4); and inspector, described as light and semi-skilled work (SVP 4); cashier/checker, described as light and semi-skilled work (SVP 3); and production assembly, described as light and unskilled work (2).
>
> The vocational expert was asked if a hypothetical person of the claimant's age and education as the claimant, with the residual functional capacity identified for the claimant could perform the claimant's past relevant work as identified by the Administrative Law Judge. The vocational witness testified that an individual with the vocational profile identified for the claimant could perform the position of sewing machine operator, inspector, cashier/checker, and production assembly. The testimony of the vocational expert is credible, persuasive, and consistent with the Dictionary of Occupational Titles (Social Security Ruling 00-4p).

(Tr. 18).

Plaintiff cites Gump v. Barnhart, 334 F. Supp.2d 1155, 1163 (E.D. Mo. 2004) and Maine v. Astrue, No. 4:07CV1074 CDP, 2008 WL 2224792 (E.D. Mo. May 27, 2008) to support the proposition that the ALJ here needed to do more. However, Gump and Maine are inapposite.

The plaintiff in Gump held a variety of past jobs including work as a kitchen helper, hand packager, and an assembly line worker at a Tracker Boats factory. Gump 334 F. Supp.2d at 1156. The ALJ found that the plaintiff could perform "past relevant work as a kitchen helper and hand packager, ***among others***." Id. at 1161 (emphasis in original). Plaintiff had worked as a kitchen helper and hand packager for very brief periods and for very low wages. Id. at

1162-1163.  As such, the court held the evidence did not support a finding that the plaintiff's past jobs as a kitchen helper and hand packager constituted substantial gainful activity.  Id. at 1163.

The court went on to hold that it could not speculate that, when the ALJ used the words "among others," he intended to include plaintiff's work at Tracker Boats.  Id.  The court further held that the ALJ failed to "satisfy the "duty to '*fully* investigate and make *explicit* findings as to the physical and mental demands" of Plaintiff's work at Tracker.  Id. (quoting Sells v. Shalala, 48 F.3d 1044, 1046 (8th Cir.1995)).  Noting that reliance on the DOT **can** satisfy an ALJ's duty to make explicit findings about the demands of past relevant work, the court held that the ALJ's reference to the DOT did not discharge the ALJ's duty because the DOT reference in that instance pertained only to the jobs of kitchen helper and hand packer – jobs the court had already decided did not qualify as past relevant work.  Id.

The ALJ in Maine v. Astrue rested his determination of the claimant's residual functional capacity exclusively on information provided by the claimant on a Social Security Administration work history form (SSA-3369-BK). 2008 WL 2224792, at *7.  Noting that there were potential contradictions among the claimant's answers on the form, the court held the ALJ needed to do more investigating in light of the inconsistencies.  Id.

Here, unlike Maine, the ALJ did not rest his RFC finding exclusively on work history forms filled out by Plaintiff.  Instead, he relied on testimony from a vocational expert who reviewed Plaintiff's work history information, listened to

Plaintiff's testimony at the hearing, asked questions of Plaintiff at the hearing, and referenced DOT job descriptions before describing Plaintiff's past relevant work.

This case is also readily distinguished from <u>Gump.</u>  Unlike <u>Gump</u>, there is no confusion in the record about which of Plaintiff's past work constitutes "substantial gainful activity."  Nor is there anything in the record to suggest that the ALJ and vocational expert were talking about anything other than Plaintiff's past work as a sewing machine operator, inspector, cashier/checker and production assembly when they made reference to specific DOT descriptions.

In sum, having reviewed the record, before determining Plaintiff's residual functional capacity, the ALJ relied on testimony from a vocational expert who, in turn, relied on information in the record about Plaintiff's work history, Plaintiff's testimony at the hearing, and specific DOT job descriptions. Plaintiff's arguments notwithstanding, this satisfies the requirement for explicit findings about the detailed demands of Plaintiff's past relevant work.  <u>See Pfitzner</u>, 169 F.3d at 569.

## 2. THE ALJ'S FAILURE TO INCLUDE REACHING AND HANDLING LIMITATIONS IN THE HYPOTHETICAL QUESTION POSED TO THE VOCATIONAL EXPERT.

Plaintiff's argument that the ALJ should have included reaching and handling limitations in the hypothetical question posed to the vocational expert is without merit.  It is well settled that a vocational expert need only consider impairments supported by substantial evidence in the record and accepted by

the ALJ as true.  See Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).  Where all of the functions that the ALJ specifically addresses in an RFC are those in which he found a limitation, the court can reasonably believe that the omitted functions were those that were not limited.  See Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003).

Here, in formulating Plaintiff's RFC, the ALJ thoroughly considered all of the evidence of record regarding the effects of Plaintiff's impairments on her ability to perform work-related activities, including Dr. Fortunato's opinion regarding reaching and handling limitations.  (Tr. 11-18).  After thoroughly considering Dr. Fortunato's findings regarding reaching and handling limitations, the ALJ determined that the assessed limitations were unsupported by the evidence of record.  (Tr. 18).  Having determined the assessed limitations were not supported by the record, the ALJ was not required to include any reaching and handling limitations in the hypothetical question to the vocational expert.

**C.    THE ALJ'S FAILURE TO HYPOTHESIZE TO THE VOCATIONAL EXPERT THAT PLAINTIFF HAD "MILD TO MODERATE TO SEVERE LEVEL OF FATIGUE AND DISCOMFORT."**

Plaintiff argued for the first time in her Reply Brief that the record is unclear as to the ALJ's finding of residual functional capacity and should be reversed.  More specifically, Plaintiff notes that the ALJ's finding of residual functional capacity as written in his decision — namely, that Plaintiff had a "mild to moderate to ***severe*** level of fatigue and discomfort" is different from

what was hypothesized to the vocational expert at the hearing.  At the hearing, the ALJ omitted the word "severe" and hypothesized only "mild to moderate fatigue and discomfort."  Reply Br., at p. 2.

Although the ALJ's opinion includes the qualifier "severe" in defining the level of fatigue and discomfort affecting Plaintiff's ability to work in a competitive environment, the ALJ's discussion in support of his RFC finding makes clear that, consistent with the hypothetical posed to the vocational expert, the ALJ did not find Plaintiff to have a ***severe*** level of fatigue and discomfort:

> While the claimant complains of severe pain and fatigue, it does not seem reasonable to conclude from the minimal findings in evidence that such could be the basis for the degree of pain alleged.  She does not appear to be experiencing progressive physical deterioration which might be expected when there is intense and continuous pain. Likewise, the claimant's routine does not appear restricted by her disability, but rather by choice.

(Tr. 16).

The fact that Plaintiff made no mention of this supposed ambiguity until her Reply brief is telling.  A review of the record makes clear that the hypothetical posed to the vocational expert is supported by substantial evidence and the inclusion of the word "severe" in the ALJ's description of Plaintiff's RFC was an error.  An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where, as here, the deficiency probably had no practical effect on the outcome of the case."  McGinnis v. Chater, 74 F.3d 873, 875 (8th Cir. 1996).

**VI.**
<u>**CONCLUSION**</u>

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED ADJUDGED AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.


/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE


Dated this <u>9th</u> day of November, 2012.